IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

MARK A. NIXON,

        Petitioner,

                                                                                             Civil No. 11-cv-890 MV-LFG

vs.

GAIL C. NIXON,

       Respondent.

**MEMORANDUM OPINION AND ORDER**

THIS MATTER comes before the Court on the Petition Pursuant to the Hague Convention and Pursuant to the International Child Abduction Remedies Act (the "Petition") [Doc. 1]. The Court, having considered the Petition, the relevant law and being otherwise fully informed, finds the Petition is well taken and will be **GRANTED**.

**BACKGROUND**

Petitioner Mark Nixon is Australian. Respondent Gail Nixon is from the United States. On or about November 24, 2007, Mr. and Mrs. Nixon were married in Aztec, New Mexico. Transcript ("Tr.") Tr. 14:12.[1] On December 25, 2007, Mr. and Mrs. Nixon left for Sydney, Australia, where they have lived together ever since. Tr. 14:18. On or about July 15, 2010, in Australia, their son, Aidin Casey Nixon, was born. Aidin did not leave Australia until on or about July 2, 2011, when Mr. and Mrs. Nixon and Aidin traveled to New Mexico to visit Mrs. Nixon's family, who live in Aztec. The parties had planned that Mr. Nixon would return to

---

[1] References to the transcript are to a rough edited version, as the transcript has not yet been finalized.

Sydney on July 10, 2011 because of work obligations, and that Mrs. Nixon and Aidin would stay on until August 31, 2011 with Mrs. Nixon's parents.  Mrs. Nixon had a return ticket booked for August 31, 2011.  On August 16, 2011, however, Mrs. Nixon canceled her return flight.  On or about August 29, 2011, Mrs. Nixon filed a divorce action in the Eleventh Judicial District Court of New Mexico.  On or about August 31, 2011, Mrs. Nixon informed Mr. Nixon by telephone that she was not coming back to Australia, and that she had filed a divorce action in order to simplify custody.  On September 29, 2011, Mrs. Nixon's counsel advised Mr. Nixon's counsel that she would return to Australia.  On October 4, 2011, however, Mrs. Nixon's counsel advised Mr. Nixon's counsel that Mrs. Nixon had changed her mind and intended to remain in New Mexico.  Mr. Nixon did not consent to Mrs. Nixon's retention of Aidin in the United States.

On October 5, 2011, Mr. Nixon filed the Petition, seeking, *inter alia*, an order directing that federal marshals and/or other law enforcement personnel be ordered to assist in picking up Aidin and returning him to the custody of Mr. Nixon, allowing the prompt return of Mr. Nixon and Aidin to Australia, directing that Aidin's travel documents be surrendered with him, and requiring Mrs. Nixon to pay Mr. Nixon's costs and attorney fees.  Along with the Petition, Mr. Nixon filed an Emergency Motion for Issuance of Order Ex Parte [Doc. 4], requesting that the Court grant the relief sought in the Petition on an emergency, ex parte basis.  Because the Court found that Mr. Nixon did not provide an adequate basis for his request for emergency relief, the Court entered an Order denying the Emergency Motion [Doc. 7].  In the Order, however, the Court found that the nature of the Petition was such as to require expedited briefing and an expedited evidentiary hearing.  Accordingly, the Court ordered that an evidentiary hearing be held on October 14, 2011, and a copy of the Order and the Petition be served personally upon

Mrs. Nixon by October 10, 2011. The Court further ordered that Mrs. Nixon file any opposition in writing no later than October 11, 2011. Mrs. Nixon did not file any written opposition.

On October 11, 2011, Mr. Nixon filed a Second Emergency Motion for Issuance of Order Ex Parte alleging that: his counsel contacted the San Juan County Sheriff on October 7, 2011 to arrange for personal service of the Order and the Petition on Mrs. Nixon; Mrs. Nixon appears to be evading personal service, but, upon information and belief, she received a copy of the Order and the Petition via email, and her attorney in the state case received copies as well; Mrs. Nixon advised Mr. Nixon, via email, that she would be "traveling for a few days," but did not disclose any information about where she would be traveling; Mrs. Nixon is not answering her telephone or returning Mr. Nixon's telephone calls; and Mrs. Nixon's current whereabouts are unknown. The Second Emergency Motion requested an emergency order directing that: Aidin's name be entered into the national police computer database ("NCIC") missing person section; Mrs. Nixon and Aidin remain within the jurisdiction of New Mexico until the underlying matter was heard; and Aidin's travel documents be surrendered to the Court. On October 12, 2011, the Court granted the Second Emergency Motion, finding that Mr. Nixon met the requirements necessary to entitle him to ex parte relief [Doc. 10]. The Court, *inter alia*, prohibited Mrs. Nixon from removing the child from this jurisdiction pending a determination on the Petition; directed Mrs. Nixon to personally appear and to provide for the appearance and physical presence of the child at the hearing; directed Mrs. Nixon to show cause why the child should not be returned to the custody of Mr. Nixon; and directed Mrs. Nixon to surrender to this Court all of the child's travel documents.

On October 13, 2011, the U.S. Marshals Service personally served Mrs. Nixon with the Order on the Second Emergency Motion and the Petition. Also on October 13, 2011, an attorney entered an appearance on behalf of Mrs. Nixon [Doc.13].

On October 14, 2011, the Court held an evidentiary hearing at which both parties testified. After hearing testimony and argument, the Court took custody of Aidin's United States and Australian passports, and issued a general ruling, to be followed by a more specific, written order to be entered no later than October 18, 2011. Tr. 105:5-9. The Court found that Mr. Nixon met his burden of showing by a preponderance of the evidence that Mrs. Nixon's retention of Aidin in the United States was wrongful. Tr. 105:17-18. The Court further found that Mrs. Nixon did not show by clear and convincing evidence that Aidin's return to Australia would either expose him to physical or psychological harm, or conflict with the fundamental principles of the United States related to the protection of human rights. Tr. 105:22-24. Accordingly, the Court ordered that Aidin be returned to Australia. Tr. 105:20-21. Pending entry of the Court's written order, the Court directed that Aidin be returned to both parents and have equal time with both parents, and that Mrs. Nixon be permitted to nurse Aidin. Tr. 107:21-108:21. The Court ordered that Mr. Nixon pay for Mrs. Nixon's flight back to Australia, and that he provide the Court with the parties' travel arrangements. Tr. 109: 3-9.

## JURISDICTION UNDER THE HAGUE CONVENTION

The Hague Convention on the Civil Aspects of International Child Abduction "seeks to deter parents who are dissatisfied with current custodial arrangements from abducting their children and seeking a more favorable custodial ruling in another country." *Navani v. Shahani*, 496 F.3d 1121, 1124 (10th Cir. 2007). Generally, it "creates an international legal mechanism

-4-

requiring contracting states to promptly return children who have been wrongfully removed to, or wrongfully retained in, their jurisdiction, without deciding anew the issue of custody." *Id*. Both the United States and Australia are signatory nations to the Hague Convention. *Feder v. Evans-Feder*, 63 F.3d 217, 221 (3d Cir. 1995). The International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. § 11601 *et seq.*, "implements the Hague Convention in the United States and grants federal and state courts concurrent original jurisdiction of actions arising under the Convention." *Navani*, 496 F.3d at 1124 (citation omitted). The ICARA "empowers the courts in the United States to determine only rights under the Convention and not the merits of any underlying child custody claims." 42 U.S.C. § 11601(b). The Hague Convention directs the Court to "act expeditiously in proceedings for the return of children." Hague Convention, Art. 11.

## DISCUSSION

Under the Hague Convention, the Court is mandated to return a child to his circumstances "prior to the abduction if one parent's removal of the child from or retention in a Contracting State has violated the custody rights of the other and is, therefore, 'wrongful.'" *Feder*, 63 F.3d at 221 (citing Hague Convention, Art. 12). The removal or retention of a child is "wrongful" where it is "in breach of rights of custody attributed to a person. . . either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention" and, at the time of removal or retention, "those rights were actually exercised, either jointly or alone." *Id.* (citing Hague Convention Art. 3). To establish a prima facie case of wrongfulness, a petitioner is required to show by a preponderance of the evidence that: (1) the respondent removed the child from his "habitual residence"; (2) the removal or

retention was in breach of the petitioner's custody rights under the laws of the state of the child's habitual residence; and (3) the petitioner was exercising those rights at the time of removal or retention. *Shealy v. Shealy*, 295 F.3d 1117, 1122 (10th Cir. 2002).

Once a petitioner satisfies his burden of establishing a prima facie case of wrongful removal or retention of a child, the child *must* be returned to his State of habitual residence unless the respondent establishes one of four defenses. *Friedrich v. Friedrich ("Friedrich II")*, 78 F.3d 1060, 1067 (6th Cir. 1996). Two of these defenses can be established by a preponderance of the evidence: "the proceeding was commenced more than one year after the removal of the child and the child has become settled in his or her new environment, Hague Convention, Article 12; or, the person seeking return of the child consented to or subsequently acquiesced in the removal or retention, Hague Convention, Article 13a." *Id.* The other two defenses must be shown by clear and convincing evidence: "There is a grave risk that the return of the child would expose it to physical or psychological harm, Hague Convention, Article 13b; or, the return of the child 'would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms,' Hague Convention, Article 20." *Id.*

All four of the exceptions are "narrow," and are "not a basis for avoiding return of the child merely because an American court believes it can better or more quickly resolve a dispute." *Id.* The federal court "retains, and should use when appropriate, the discretion to return a child, despite the existence of a defense, if return would further the aims of the Convention." *Id.*

A.  Mr. Nixon's Prima Facie Case

1.  Habitual Residence

The term "habitual residence" is "not defined by either the Hague Convention or the ICARA." *Kanth v. Kanth*, 232 F.3d 901, 2000 WL 1644099, *1 (10th Cir. Nov. 2, 2000). Federal courts have noted that "[a] person can have only one habitual residence. On its face, habitual residence pertains to customary residence prior to the removal." *Friedrich v. Friedrich ("Friedrich I")*, 983 F.2d 1396, 1401 (6th Cir. 1993). Federal courts have interpreted the child's "habitual residence" to be "the place where he or she has been physically present for an amount of time sufficient for acclimatization and which has a 'degree of settled purpose' from the child's perspective." *Feder*, 63 F.3d at 224. In determining whether any particular place satisfies this standard, the court must "focus on the child" and analyze "the child's circumstances in that place and the parents' present, shared intentions regarding their child's presence there." *Id.* It is "past experiences, not future intentions" that must be considered. *Sorenson v. Sorenson*, 559 F.3d 871, 873 (8th Cir. 2009). Moreover, habitual residence "may only be altered by a change in geography and passage of time." *Id.* Finally, in cases where "the child's initial translocation from an established habitual residence was clearly intended to be of a specific, delimited period," courts generally have "refused to find that the changed intentions of one parent led to an alteration in the child's habitual residence." *Maxwell v. Maxwell*, 588 F.3d 245, 251 (4th Cir. 2009).

Mrs. Nixon argues that the United States, rather than Australia, is Aidin's habitual residence, because she never intended to be domiciled in Australia, but rather always intended to move back to Aztec, and, at some point in the past, believed that Mr. Nixon agreed to move to

-7-

the United States. Tr. 8:8-24; 102:5-24. According to Mrs. Nixon, because Aidin is so young, his habitual residence is connected to his mother, and because she intended to move home to Aztec, Aztec is Aidin's habitual residence. *Id.*

Neither the evidence nor the relevant case law supports Mrs. Nixon's position. It is undisputed that, since their marriage, Mr. and Mrs. Nixon have lived continuously in Australia. Tr. 26:24-27:4. Mrs. Nixon is a permanent resident of Australia. Tr. 27:5-7. Aidin was born in Australia and never left Australia until this trip to New Mexico. Mr. Nixon testified that it was never his intent to move to the United States. Tr. 48:10-13. In fact, Mrs. Nixon admitted in her testimony that although *she* wanted to move back to Aztec at some point in the near future, Mr. Nixon did not share the same intention, and told her in no uncertain terms that he did not wish to relocate there. Tr. 14:19-16:9. Mrs. Nixon further admitted that she is presently in the United States for what she intended to be a two-month vacation, and it was not until she had been here for six weeks that she decided not to return to Australia. Tr. 28:15-29:7; Tr. 45:24-46:4. Indeed, Mrs. Nixon actually had a ticket to return to Australia with Aidin on August 31, 2011. *Id.*

Considering Aidin's past experiences and the parties' shared intentions, it is clear that Australia is the only place where Aidin has been physically present for an amount of time sufficient for acclimatization, and which has a "settled purpose" from his perspective. Mr. and Mrs. Nixon had no shared intention that Aidin reside in Aztec, New Mexico. Although the parties brought Aidin to the United States, the trip was intended by both of them to be of a specific period of two months. The fact that Mrs. Nixon unilaterally changed her intentions six weeks into the visit is insufficient to alter Aidin's habitual residence.

Accordingly, "[t]his is a simple case." *Friedrich I*, 983 F.2d at 1402 (child found to be habitual resident of Germany where he was born in Germany and resided exclusively in Germany until his mother removed him to the United States, despite mother's argument that she intended to return to the United States with the child when she was discharged from the military). Aidin was born in Australia and resided exclusively in Australia until Mrs. Nixon retained him in the United States. *See id.* The Court thus finds that Aidin was a habitual resident of Australia at the time of his retention in the United States. *See id.*

    2.    <u>Custodial Rights</u>

"[T]he Convention calls into play a State's choice of law rules as well as its internal custody rights laws." *Feder*, 63 F.3d. at 225. Because Australia would apply its own laws in this case, Mr. Nixon's "custody rights are determined by Australia's Family Law Act 1975, of which [this Court] may take notice directly." *Id.*

Under Australia's Family Law Act 1975, "in the absence of any orders of court, each parent is a joint guardian and a joint custodian of the child, and guardianship and custody rights involve essentially the right to have and make decisions concerning daily care and control of the child." *Id.* at 225-26 (citing Family Law Act §§ 63(F)(1), 63E(1) and (2)). As there are no court orders to the contrary, Mr. Nixon has joint custody and control of Aidin. Accordingly, Mrs. Nixon's unilateral decision to retain Aidin in the United States was in breach of Mr. Nixon's custody rights under the laws of Australia, the state of Aidin's habitual residence.

    3.    <u>Exercise of Custodial Rights</u>

The Court "liberally find[s] "exercise" whenever a parent with *de jure* custody rights keeps, or seeks to keep, any sort of regular contact with his or her child." *Friedrich*, 78 F.3d at

1067. Accordingly, "if a person has valid custody rights to a child under the law of the country of the child's habitual residence, that person cannot fail to 'exercise' those custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child." *Id*.

The evidence demonstrates that, far from abandoning his child, Mr. Nixon lived with Mrs. Nixon and Aidin "as a family." Tr. 45:14-17. Further, when Aidin was born, Mr. Nixon took four weeks leave from work to care for him. Tr. 89:5-6. Mrs. Nixon testified that when she was at work every Friday, Saturday and Sunday evening, Mr. Nixon watched Aidin and put him to bed. Tr. 43:15-44:17. Mr. Nixon similarly testified that he helped Mrs. Nixon "as much as possible, in terms of raising Aidin," which involved "doing anything from looking after Aidin, . . . taking him for walks, bathing him, putting him to bed, reading him stories, playing with him." Tr. 88:10-15. Accordingly, the Court finds that Mr. Nixon was exercising his custodial rights at the time of Mrs. Nixon's retention of Aidin in the United States.

    4.    <u>Conclusion</u>

Mr. Nixon established by a preponderance of the evidence that Australia is Aidin's habitual residence, that Mrs. Nixon's retention of Aidin in the United States was in breach of Mr. Nixon's custody rights under Australian law, and that Mr. Nixon was exercising his custody rights at the time of retention. Accordingly, Mr. Nixon made a prima facie case of wrongful retention. The burden thus shifted to Mrs. Nixon to establish a defense.

B.    <u>Defense to Prima Facie Case of Wrongfulness: Risk of Grave Harm</u>

Mrs. Nixon concedes that her decision to retain Aidin in the United States was unilateral, and thus that Mr. Nixon did not consent to Aidin's retention here. Further, it is indisputable that

Mr. Nixon filed the Petition well within one year of Mrs. Nixon's failure to return to Australia, as planned. Accordingly, neither of the first two defenses applies. Mrs. Nixon does not argue that return of Aidin to Australia would violate principles of the United States related to human rights. The sole defense argued by Mrs. Nixon is that Aidin would be exposed to a grave risk of harm if returned to Australia.

Mrs. Nixon alleges that Aidin would suffer grave harm if he were taken from his mother, as she is still nursing him. Tr. 9:4-10. Further, Mrs. Nixon alleges that Mr. Nixon was diagnosed with ALS and suffers from obsessive/compulsive disorder, both of which conditions call into question his ability to care for Aidin. Tr. 9:17-10:16. Finally, Mrs. Nixon alleges that Mr. Nixon informed her that upon her return to Australia, he would take sole custody of Aidin and that she could live "somewhere," perhaps with her brother who lives five hours away from the marital residence, which would be an intolerable situation for Aidin. Tr. 10:20-11:15.

In support of these allegations, Mrs. Nixon testified that several times, Mr. Nixon has held Aidin and fallen over, and she is worried that he will again hold Aidin and fall. Tr. 19:10-16. Mrs. Nixon also testified that Mr. Nixon is controlling and rigid, and disagrees with her as to issues such as Aidin's feeding and sleeping schedules. Tr. 17:19-19:7. Additionally, Mrs. Nixon testified that when she asked Mr. Nixon what would happen if she returned to Australia, he "made it clear that [she] might be able to live with him, maybe not." Tr. 21:22-22:10. She further testified that, when she asked him where she was supposed to live, he responded, "I don't know, but we'll figure it out," and indicated that he could take leave from work and have primary custody of Aidin for a period of time. *Id.* Based on this conversation, Mrs. Nixon became afraid that Mr. Nixon expected her to "land in Australia, hand Aidin over, and be

basically on the streets." *Id.* Mrs. Nixon testified: [I]t's still very alarming to fly halfway across the world, get off a plane, and not know where you're going to live and how you're going to be supported, especially with an infant that I'm still breast feeding. That is unacceptable and intolerable for myself and for our son." Tr. 36:25-37:6.

Federal courts uniformly note that "[t]he bar for proving the 'grave risk' exception is set exceptionally high." *Krefter v. Wills*, 623 F. Supp. 2d 125, 135 (D. Mass. 2009). In interpreting the Hague Convention, the State Department has made clear that the grave harm exception "was not intended to be used by defendants as a vehicle to litigate (or relitigate) the child's best interests." *Friedrich II*, 78 F.3d at 1068 (citing Public Notice 957, 51 FR 10494, 10510 (Mar. 26, 1986)). Accordingly, "[o]nly evidence directly establishing the existence of a grave risk that would expose the child to physical or emotional harm or otherwise place the child in an intolerable situation is material to the court's determination." *Id.* Moreover, the risk of harm must be "grave, not merely serious." *Id.* Particularly relevant here, the State Department specifically stated that an "intolerable situation" was not intended to encompass return to a home where money is in short supply." *Id.* at 1068-69. Rather, the only example of an "intolerable situation" provided by the State Department is "one in which a custodial parent sexually abuses the child." *Id.* at 1069.

Applying this standard, in *Friedrich II*, the Court rejected the respondent mother's argument that the return of her two year-old son to Germany would cause him grave psychological harm because it would be traumatic and difficult for him to be apart from his mother. *Id.* at 1067. Noting that Mrs. Friedrich had made no allegation that Mr. Friedrich had ever abused their child, the Court stated, "[if] we are to take the international obligations of

-12-

American courts with any degree of seriousness, the exception to the Hague Convention for grave harm to the child requires far more than the evidence that Mrs. Friedrich provides." *Id.*

Similarly, Mrs. Nixon's allegations here fall short of establishing a grave risk of harm if Aidin is returned to Australia. Mrs. Nixon intends to return to Australia along with Aidin. Accordingly, any danger that would result from Aidin's separation from his mother will not come to pass. Notably, an order that Aidin be returned to Australia is not the equivalent of an order that Mr. Nixon is entitled to *sole* custody of Aidin. Indeed, Mr. Nixon testified that it is not his intention to take sole custody of Aidin upon his return to Australia. Tr. 50:24-51:16. Rather, he explained that he has the opportunity to take five months paid leave to care for Aidin, so long as "he is designated the primary caregiver," and that this is "an option for discussion with [Mrs. Nixon]." *Id.*

Further, Mrs. Nixon's concerns about Mr. Nixon's fitness as a parent are unsupported. Mr. Nixon testified that he has not been officially diagnosed with ALS, and Mrs. Nixon has presented no evidence that any doctor has ever advised him that it is unsafe for him to care for Aidin. Tr. 64:1-4. Mr. Nixon has been in counseling for years for his emotional issues, and he has never been advised by a counselor that his OCD interferes with his ability to care for Aidin. Tr. 62:14-18. Indeed, until they left for the United States, Mrs. Nixon routinely entrusted Aidin to Mr. Nixon's care. Tr. 43:15-44:17. Mr. Nixon appreciates the difficulties that might arise because of his tendency toward leg cramping (whatever the diagnosis for that cramping ultimately might be), and has agreed to take precautions, including not holding Aidin while he is standing up, unless and until such time as his treating physician recommends otherwise.[2]  Mr.

---

[2] After the hearing, Mrs. Nixon requested that the Court's Order include a directive prohibiting Mr. Nixon from holding Aidin while standing. Although Mr. Nixon did not object to the

Nixon's appreciation of his condition and willingness to take precautions should sufficiently allay Mrs. Nixon's concerns about Aidin's safety when in his father's care.

Similarly, Mrs. Nixon's testimony as to her experience of Mr. Nixon as controlling does not rise to the level required to establish that Aidin's return to Australia will expose him to a grave risk of harm. While her testimony demonstrates parenting and personality differences, such differences are not uncommon, and certainly do not demonstrate that Mr. Nixon poses a danger to his son.

Finally, courts routinely have held that financial concerns are insufficient to establish an "intolerable situation." *Krefter*, 623 F. Supp. 2d at 136-37; *Wilchynski v. Wilchynski*, No. 3:1-CV-63, 2010 WL 1068070, *9 (S.D. Miss. Mar. 18, 2010). Accordingly, Mrs. Nixon's fears about her ability to support herself and maintain a home where she can nurse and properly care for Aidin do not meet the standard necessary to show a risk of grave harm. Because Mrs. Nixon thus has failed to establish a valid defense to her wrongful retention of Aidin in the United States, Aidin must be returned to Australia.

The Court, however, "need not turn a blind eye to a very real potential for harm upon a child's return." *Krefter*, 623 F. Supp. 2d at 137. The parties' testimony established that, although she has worked at various part-time jobs during the marriage, Mrs. Nixon has been Aidin's primary caretaker, and has been dependent on Mr. Nixon for her financial support. The Court finds that a prolonged separation from his mother would be quite detrimental to Aidin. Indeed, Mr. Nixon testified that he would never want to keep Aidin from Mrs. Nixon, would want Aidin to be able to see her on a daily basis, and would hope that Aidin will continue

---

request, this Court does not find it appropriate to include such a directive in the Order, as it goes beyond the issues before the Court.

nursing. Tr. 67:15-17; 68:11-12; 58:15-17. Without continued financial support and a place to live provided by Mr. Nixon, however, Mrs. Nixon will be unable to return to Australia with the necessary stability to continue to care for Aidin. In this situation, the Court has "the authority to impose conditions, known as undertakings, to ensure that a potential harm does not manifest when a child returns to his or her country of habitual residence." *Id.* (citing *Kufner v. Kufner*, 480 F. Supp. 2d 491, 515 n.3 (D.R.I. 2007) ("[W]here the potential for harm is real, even if it does not meet the Article 13(b) definition, [a court] . . . has an obligation to attempt to ensure that it does not manifest."), *aff'd*, 519 F.3d 33, 41 (upholding conditions imposed by district court on child's return); *see also Feder*, 63 F.3d 217, 226 (3d Cir. 1995) (instructing a district court that, in the event it concludes that a mother's grave harm defense falls short but that an "unqualified return order would be detrimental" to the child, "the court should investigate the adequacy of undertakings . . . to ensure that [the child] does not suffer shortterm harm").

At the hearing, Mr. Nixon proposed that, in the event the parties decide they cannot live together, Mrs. Nixon would continue to live in the marital residence. Tr. 67:25-68:7; Tr. 91:1-9. Mr. Nixon offered to move to his parents' home or to the parties' rental unit. *Id.* Mr. Nixon further offered to provide support and maintenance to Mrs. Nixon, for herself and for the marital home, until such time as an Australian court makes a decision, or the parties make a decision about their future. Tr. 91:10-25. The Court appreciates and accepts Mr. Nixon's proposed undertakings, and will order that Mrs. Nixon will continue to live in the marital residence, and Mr. Nixon will provide Mrs. Nixon with maintenance and support, until such time as the courts in Australia make other arrangements for the parties.

C.  Award of Fees and Costs

The ICARA provides for an award of fees and costs to prevailing parties in an action brought pursuant to the Hague Convention. Specifically, the ICARA states:

> Any court ordering the return of a child pursuant to an action brought under section 11603 of this title shall order the respondent to pay necessary expenses incurred by or on behalf of the petitioner, including court costs, legal fees, foster home or other care during the course of proceedings in the action, and transportation costs related to the return of the child, unless the respondent establishes that such order would be clearly inappropriate.

42 U.S.C. § 11607(b)(3). With regard to his request for costs and fees, Mr. Nixon is directed to file a motion complying with the requirements of D.N.M. LR-Civ 54.5 within thirty days of entry of this Order.

## CONCLUSION

Mr. Nixon has established by a preponderance of the evidence that Mrs. Nixon's retention of Aidin in the United States was wrongful. Mrs. Nixon has not shown by clear and convincing evidence that Aidin's return to Australia poses a grave risk that he will be exposed to physical or psychological harm. Because Mrs. Nixon has presented no valid defense to her retention of Aidin in the United States, Aidin must be returned to Australia. Mrs. Nixon will return to Australia along with Aidin and Mr. Nixon. Because Mrs. Nixon has been Aidin's primary caretaker and Mr. Nixon has been her sole source of financial support, Mrs. Nixon will continue to live in the marital residence and Mr. Nixon will continue to provide Mrs. Nixon with adequate maintenance and support, until such time as the courts in Australia make other arrangements for the parties. Mr. Nixon shall file a motion for costs and fees within thirty (30) days of entry of this Order.

**IT IS THEREFORE ORDERED** that Aidin shall be returned to Sydney, Australia. Because of her connection to Aidin, and the fact that she is still nursing him, Mrs. Nixon will return to Sydney, Australia along with Aidin.  In accordance with the Court's ruling from the Bench on October 14, 2011, Mr. Nixon has purchased airline tickets for the parties to return to Australia.  Mr. Nixon, Mrs. Nixon and Aidin will depart Albuquerque (ABQ) on Wednesday, October 19, 2011 on United Airlines Flight #5364, leaving at 12:10 p.m. and arriving in San Francisco (SFO) at 1:38 p.m.  From there, they will depart San Francisco at 10:59 p.m. on October 19, 2011 and arrive in Sydney (SYD) at 7:25 a.m. on Friday, October 21, 2011 on United Airlines Flight #0863.  Aidin's travel documents are available to be picked up by Mr. Nixon at the Clerk's Office, United States District Courthouse, 106 South Federal Place, Santa Fe, New Mexico.

**IT IS FURTHER ORDERED THAT,** although Mrs. Nixon intends to seek employment upon her return to Australia, Mrs. Nixon has been Aidin's primary caretaker, has had only part-time employment, and has been dependent on Mr. Nixon for financial support. Accordingly, in order to allow Mrs. Nixon to return to Australia with the necessary stability to continue to care for Aidin and thereby prevent harm to Aidin from a prolonged separation from his mother, as Mr. Nixon proposed during the October 14, 2011 hearing, Mrs. Nixon shall continue to live in the marital residence and Mr. Nixon shall continue to provide Mrs. Nixon with adequate maintenance and support, until such time as the courts in Australia make other arrangements for the parties.

**IT IS FURTHER ORDERED THAT**, within thirty (30) days of entry of this Order, Mr. Nixon shall file a motion, pursuant to 42 U.S.C. Section 11607(b)(3), for costs and fees. The motion shall comply with the requirements of D.N.M. LR-Civ 54.5.

DATED this 18th day of October, 2011.

_____
MARTHA VAZQUEZ
United States District Court Judge

Attorney for Petitioner:

Elizabeth Drotning Hartwell, Esq.

Attorney for Respondent:

Priscilla Shannon, Esq.